## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JEANIE HANO,** 496661                                   **CIVIL ACTION**

**VERSUS**                                               **NO. 09-7741**

**WARDEN, LOUISIANA**                                    **SECTION "S" (6)**
**CORRECTIONAL INSTITUTION**
**FOR WOMEN**

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b) (1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the record, the Court has determined that this matter can be disposed of

without an evidentiary hearing.[1]  For the reasons set forth below, it is recommended that the

instant petition be **DENIED WITH PREJUDICE**.

## PROCEDURAL BACKGROUND

JEANIE HANO is a state prisoner currently incarcerated at the Louisiana

Correctional Institute for Women in St. Gabriel, Louisiana. Hano is serving a life sentence,

after being convicted on April 21st, 2005 of second degree murder, a violation of La. R.S.

14:30.1.[2]  Hano was sentenced to a life sentence, without benefit of parole, probation or

suspension of sentence for her crime.[3]

Hano took a direct appeal, raising the following claims for relief: 1) Trial court erred

in admitting 404(b) (other crimes) evidence; 2) the evidence was insufficient to support her

conviction under La.R.S. 14:30.1A(3); 3) trial court imposed an excessive sentence; 4) that

---

[1]Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination. According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

[2]Although Hano was indicted under the general second degree murder provision of La.R.S. 14.30.1, she was clearly convicted under La.R.S. 14.30.1A(3), which defines second degree murder as the killing of a human being when, among other things, the offender unlawfully distributes or dispenses a controlled dangerous substance classified in Schedule I or II, which is the direct cause of the death of the recipient who ingested or consumed the substance. See explanation of the same in *State v. Hano*, 938 So.2d 181, 186 n.6 (La. App. 1st Cir. 2006).

[3]See State Rec. vol. 6 of 8, Minute Entry dated May 5, 2005.

she received ineffective assistance of counsel, contending that the trial counsel failed to

effectively cross-examine the State's witnesses and to adequately prepare the defense experts

for trial; and she requested review of the record for "patent" errors.  Hano's conviction and

sentence were affirmed by the Louisiana First Circuit Court of Appeal, on June 9, 2006.[4]

However, the court did not review the issue of ineffective assistance of counsel, finding that:

> the claim is more properly raised by an application for post-conviction relief
> where a full evidentiary hearing may be conducted. Only where the record
> discloses sufficient evidence to decide the issue of ineffective assistance of
> counsel when raised on assignment of error on appeal, may it be addressed in
> the interest of judicial economy. . . The investigation of strategy decisions
> requires an evidentiary hearing and, therefore, cannot possibly be reviewed on
> appeal.

*State v. Hano,* 938 So.2d at195 (citations omitted). Thus, the court found that petitioner's

claims of ineffective assistance were not subject to appellate review on appeal.[5]

Hano then sought certiorari review in the Louisiana Supreme Court, raising the

following claims: 1) Insufficiency of the evidence; 2) police failed to fully investigate; 3) the

state juvenile witness was unreliable; 4) the First Circuit erred in its ruling regarding the

admission of other crimes (404(b)) evidence; 5) the First Circuit erred in its ruling regarding

---

[4]*See State v. Hano*, 938 So.2d 181 (La. App. 1ˢᵗ Cir. 2006)(writ no. 2005-KA-2090), a copy of the briefs and ruling  can be found in State Court Rec. vol. 7 of 8.

[5]One appellate judge dissented, assigning the following reason: "The medical evidence in record before us simply shows that the methadone provided by the defendant was one of several drugs in the victim's system that contributed to his death.  Thus, the State did not meet its burden of proving beyond a reasonable doubt that the methadone provided by the defendant was *the direct* cause of the victim's death." *See* dissent of Guidry, J. in *State v. Hano*, 938 So.2d at 196.

excessive sentence; and, 6) the First Circuit erred in its ruling not to review the asserted claims of ineffective assistance of counsel. The Louisiana Supreme Court summarily denied the writ.[6]

Hano next sought post-conviction remedies in the trial court, with regard to the following claims: 1) insufficiency of the evidence; 2) erroneous admission of other crimes (404(b)) evidence; 3) excessive sentence/cruel and unusual punishment; 4) ineffective assistance of counsel; 5) the state failed to disclose "deals" allegedly given to Crystal Guidera and Chad Falgout, in return for their testimony; and, cumulative error.[7] On February 11, 2008, the trial court denied all the claims raised, however, as repetitive, stating that the claims were previously raised on appeal.[8] The First Circuit Court of Appeal denied relief on June 20, 2008, denying the writ in part on the showing made, and in part on the merits.[9] However, in a subsequent ruling, the First Circuit Court of Appeal granted the writ in part and denied it in part, ruling that, to the extent the trial court found that all claims were previously raised on direct appeal, this was incorrect relative to the ineffective assistance of

---

[6]*State v. Hano*, 948 So.2d 164 (La., Jan.26, 2007).

[7]A copy of this application can be located in State Court Rec. vol. 7 of 8.

[8]With regard to the ineffective assistance claims, this ruling effectively undermined the opinion of the First Circuit on direct appeal as that court had deferred reviewing the ineffective assistance of counsel claims on direct appeal and instead instructed Hano to bring those claims in post-conviction proceedings. *See* Trial Court's ruling denying PCR, dated 2/11/08, in State Court Rec. vol. 8 of 8.

[9]*See* Ruling of the First Circuit in Writ 2008-KW-0474,State Rec. vol. 8 of 8.

counsel claims. Therefore, the First Circuit remanded the ineffective assistance of counsel

claims to the trial court and otherwise denied the writ.[10]

On remand, the trial court did not order an evidentiary hearing to be held. Instead, the

court ruled:

> After a review of the record of defense counsel's performance throughout the
> entirety of the proceeding and trial, and efforts expended to establish a
> defense, it is clear that the defendant was afforded effective legal
> representation within the guarantees of the Sixth Amendment and that a
> reliable verdict was rendered in the case.  The evidence overwhelmingly
> supports defendant's conviction and there is no reasonable probability that any
> alleged unprofessional errors on behalf of counsel would have resulted in the
> proceeding having a different outcome. Accordingly, all of defendant's
> (ineffective assistance of counsel) claims in her application for post-conviction
> relief are denied.[11]

Petitioner once again filed for a supervisory writ of review in the Louisiana Court of

Appeal, First Circuit, appealing the trial court's denial of her ineffective assistance of counsel

claims. The First Circuit denied the writ, with one judge dissenting.[12] A subsequent appeal

to the Louisiana Supreme Court was denied on November 20, 2009.[13]

---

[10]*See* First Circuit ruling dated October 24, 2008, in writ no. 2008-K-1377, a copy of which is located in State Rec. vol. 8 of 8.

[11]*See* Trial Court ruling dated November 24th, 2008, a copy of the ruling is located in State Rec. vol. 8 of 8.

[12]Judge Hughes would have ordered the trial court to conduct an evidentiary hearing. *See* April 3, 2009 Ruling of the First Circuit, in writ no. 2008-KW-2562. A request for rehearing was not considered.

[13]*State ex rel. Hano v. State*, 25 So.3d 796 (La. 11/20/09).

The instant application for federal habeas relief was filed in this court on December 18, 2009 but signed by Hano and assumed tendered to the prison custodian on December 10, 2009.[14] Therein, Hano raises the following claims:[15]

1) Whether petitioner was denied her right to due process of law under the Fourteenth Amendment when she was convicted on insufficient evidence;

---

[14]Under the prison mailbox rule applied by the U.S. Fifth Circuit Court of Appeals, Hano's *pro se* petition would be deemed filed as of the date she placed it in the prison mail system. *Hernandez v. Thaler*, 630 F.3d 420 (5th Cir. 2011), citing *Stoot v. Cain*, 570 F.3d 669, 671 (5th Cir. 2009)(per curiam). Generally, the date a prisoner signs a petition is presumed to be the date she delivered it to prison officials for mailing. *See Colarte v. Leblanc*, 40 F.Supp.2d 816, 817 (E.D. La. 1999) (assumed that petitioner turned his habeas corpus application over to prison officials for delivery to this Court on the date he signed his application); *Magee v. Cain*, 2000 WL 1023423, *4 n.2 (E.D. La. 2000) (inferred that filing date and signature date of habeas petition were the same); *Punch v. State*, 1999 WL 562729, *2 n.3 (E.D. La. 1999) (may reasonably be inferred that prisoner delivered habeas petition to prison officials for mailing on date he signed petition). In this case, Hano signed the petition (Rec. Doc. 1 at p. 61) as of November 30, 2009 but then also signed the petition on her AO240 habeas form as of December 10, 2009 (Rec. Doc. 1 at p. 78). Therefore, the earliest date that Hano could have tendered the petition to her custodian for mailing would be December 10, 2009.

[15]Petitioner also asserts various violations of the Louisiana Constitution in her claims, but such claims are not cognizable in federal habeas review. Violations of state law and procedure which do not infringe specific federal constitutional rights are generally not cognizable in habeas corpus. Federal habeas relief is not available for alleged errors in the interpretation or application of state law. *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L. Ed.2d 385 (1991). It is well established that federal habeas review is limited to questions of constitutional dimension. See generally, *Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert. denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *Castillo v. Johnson*, 141 F.3d 218, 222 and 224 (5th Cir.), *cert. denied*, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998). To the extent petitioner asserts claims arising under state law, those claims will not be addressed by this court.

2) whether the state courts erred in allowing the introduction of other crimes and extrinsic offenses (404(b) evidence) where the court failed to conduct a hearing on the state's second notice of intent to introduce such evidence;

3) whether petitioner's sentence is cruel and unusual punishment and/or an excessive sentence  in violation of the 8th Amendment;

4) whether petitioner was denied the effective assistance of counsel guaranteed by the 6th Amendment;

5) whether the state failed to disclose that witnesses Crystal Guidera and Chad Falgout received "deals" from the state in return for their cooperation and testimony against petitioner; and,

6) whether the cumulation of error in the case renders the conviction unconstitutional.[16]

The State filed a response to Hano's federal habeas petition, therein conceding that the federal petition was timely filed but asserting that Hano has failed to exhaust all of the issues raised in her federal petition.[17]

---

[16]*See* Petition, Rec. Doc. 1 at pp. 23 for issues presented.

[17]*See* Response and Memorandum, Rec. Doc. 13 and 14.

## EXHAUSTION

Federal law is clear that a state prisoner must exhaust available state court remedies as to each ground upon which he claims entitlement to habeas corpus relief.  28 U.S.C. § 2254(b)(1); *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198 (1982); *Preiser v. Rodriguez*, 411 U.S. 475, 93 S. Ct. 1827 (1973); *Serio v. Members of the Louisiana Board of Pardons*, 821 F. 2d 1112, 1117 (5th Cir. 1987).  A total exhaustion rule promotes comity and such a rule does not unreasonably impair a prisoner's right to relief.  *Rose*, 455 U.S. at 522, 102 S. Ct. at 1205.  Generally, the exhaustion requirement is satisfied only when the grounds urged in a federal petition were previously presented to the state's highest court in a procedurally proper manner.  *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988). See also, *Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003), citing *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir.1997),  *Picard v. Connor*, 404 U.S. 270, 275-76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) (To satisfy the exhaustion requirement, "a habeas petitioner must have fairly presented the substance of his claim to the state courts.")

The State filed a response to Hano's federal habeas petition asserting that Hano has failed to exhaust all of the issues raised in her federal petition.[18] Specifically, the State claims that Hano did not exhaust her claims of ineffective assistance of counsel because the writ that

---

[18]*See* Response and Memorandum, Rec. Doc. 13 and 14.

was before the Louisiana First Circuit in which those claims were denied on the merits, Writ

No. 2008-KW-2562, was not considered by the Louisiana Supreme Court in its subsequent

denial of Hano's claims in Writ No. 2008-KH-2954.  Review of that denial shows that only

Writ Nos. 2008-KW-1377 and 2008-KW-0474, both arising out of the Louisiana First

Circuit, were referenced by the Louisiana Supreme Court.   However, a member of the

undersigned Magistrate Judge's staff went to the Clerk's Office for the Louisiana Supreme

Court to review the file for Writ No. 2008-KH-2954 and discovered the following procedural

history:

Hano filed an application for review, Writ No. 2008-KH-2954,  with the Louisiana

Supreme Court on December 17, 2008, with a signature date of November 6, 2008, raising

the claims of insufficient evidence, wrongful admission of 404(b) "other crimes" evidence,

excessive  sentence /cruel and unusual punishment, ineffective assistance of counsel, failure

to disclose the "deals" with state witnesses (Guidera and Falgout), and cumulative error,

claims previously litigated in the lower courts. Accompanying the original writ application

was a "Motion for Stay and Hold Writ of Certiorari in Abeyance", filed by Hano, *pro se*.

Therein, Hano noted that she was filing her request for review with the Louisiana Supreme

Court relative to the decisions made by the First Circuit. However, since the First Circuit had

remanded the ineffective assistance of counsel claims to the trial court, not all of the claims

had been resolved which were raised in Writ No. 2008-KW-0474.  Rather than piecemeal the

litigation, Hano requested that the Louisiana Supreme Court stay her application until such time as the trial court had resolved the ineffective assistance of counsel claims and the First Circuit had reviewed the same. Attached to the application filed with the Louisiana Supreme Court were the rulings by the First Circuit in Writ Nos. 2008-KW-1377 and Writ No. 2008-KW-0474. Noted on the front of the application, apparently by staff of the Louisiana Supreme Court, was the following: "Hold for lower ct j's on remand claims" (i.e., Hold for the lower court's judgment on the remanded claims). Also in the record relative to the Louisiana Supreme Court's ruling in 2008-KH-2954, was a second supplemental volume filed on or about May 8, 2009, containing a "Motion to Remove Stay and Consolidate the Previous Writ of Certiorari and this Writ of Certiorari". Therein, Hano indicated that the trial court and the appellate court had made a final ruling on her remanded claims of ineffective assistance of counsel. Included in the supplemental filing was a letter from the Louisiana Supreme Court acknowledging Hano's earlier request for "an extension of time" to file a supplement.[19] Also included was the supplemental writ appealed from, Louisiana First Circuit Writ No. 2008-KW-2562, as well as the trial court's November 24, 2008 reasons for its denial on the merits of Hano's ineffective assistance of counsel claims. Based upon the foregoing procedural history, it appears that the Louisiana Supreme Court's ruling on Writ

---

[19]See Letter dated February 26, 2009 by from the Louisiana Supreme Court Central Staff, attached to "Supplement", 08-KH-2954. A copy of the original petition filed with the Louisiana Supreme Court in 08-KH-2954 as well as of the supplemental petition have been filed into the federal record, a copy of each being provided to the parties by this Court's Clerk's Office.

No. 2008-KH-2954 did, in fact, address Hano's ineffective assistance of counsel claims in a procedurally proper manner. Accordingly, the State's asserted defense that Hano is barred from federal review due to her failure to exhaust state court remedies is hereby REJECTED. Thus, the court proceeds to the merits of the claims raised by Hano in her federal petition.

## FACTS[20]

On July 9, 2003, Crystal Guidera discovered her sixteen-year-old boyfriend, T.J.J., unconscious.[21] Crystal contacted defendant with whom she had lived periodically and to whom she referred to as "Aunt Jeanie" although the two were not actually related.[22] Defendant in turn contacted her fiancé, Chad Falgout, to assist T.J.J. regain consciousness. After several unsuccessful attempts of reviving T.J.J., defendant drove him to St. Tammany Parish Hospital in Covington, Louisiana. T.J.J. never regained consciousness during his hospitalization and needed to use a ventilator until he died on August 2, 2003. According to his death certificate, T.J.J. died of a polysubstance drug overdose of methadone and benzodiazepines.

---

[20]The facts are adopted from the state court opinion on direct appeal, see *State v. Hano*, 938 So.2d at 184-85.

[21]In accordance with La. R.S. 46:1844 W, the minor victim was referred to only by his initials.

[22]Since the time Crystal was an infant, she had lived with defendant periodically and, although they were not related, had referred to defendant as "Aunt Jeanie."

## STANDARD OF REVIEW

This habeas proceeding is subject to the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, because Hano filed her federal petition on December 10, 2009, well after AEDPA's effective date.  See *Lindh v. Murphy*, 521 U.S. 320, 335–36 (1997).  "Under AEDPA, if a state court has adjudicated a habeas petitioner's claims on the merits, he may receive relief in the federal courts only where the state court decision 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  *Rivera v. Quarterman*, 505 F.3d 349, 356 (5th Cir. 2007), (quoting 28 U.S.C. § 2254(d)),  *cert. denied*, --  U.S. --, 129 S.Ct. 176, 172 L.Ed.2d 44 (2008).

"A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts." *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (citing *Williams v. Taylor*, 529 U.S. 362, 404–08, 120 S. Ct. 1495 (2000)).  To merit habeas relief, a state habeas court's application of federal law must be not only incorrect but "objectively

unreasonable." *Renico v. Lett*, –U.S. –, 130 S. Ct. 1855, 1865, 176 L.Ed.2d 678 (2010). *See also*, *Schriro v. Landrigan*, 550 U.S.465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold.")

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000); 28 U.S.C. § 2254(e)(1).

## <u>INSUFFICIENT EVIDENCE</u>

In her federal habeas petition, Hano claims that the evidence was insufficient to convict her of second degree murder. Hano specifically challenges the sufficiency of the evidence on three grounds: 1) the State allegedly failed to prove that the methadone was <u>the direct cause</u> of the victim's death; 2) the police failed to conduct a complete investigation of the case; and 3) the State based its case upon an allegedly unreliable juvenile witness, Crystal Guidera.

The Supreme Court established the due process standard that a reviewing court must utilize in analyzing the sufficiency of the evidence in *Jackson v. Virginia***,** 443 U.S.

307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  Pursuant to *Jackson*, the inquiry is whether,

viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime, as identified by state substantive law,

to have been proven beyond a reasonable doubt.  *Id.* at 316-17, 99 S.Ct. at 2787.  In a federal

habeas corpus proceeding, great deference must be given to the factual findings in the state

court proceedings such that the reviewing court must defer to the jury's resolution of

credibility determinations and the justifiable inferences of fact that can be drawn from these

determinations.  *Knox v. Butler*, 884 F.2d 849, 851 (5th Cir. 1989).  Further, the habeas

corpus statute obliges federal judges to respect credibility determinations made by the trier

of fact.  *Pemberton v. Collins*, 991 F.2d 1218, 1225 (5th Cir. 1993), *cert. denied*, 114 S.Ct.

637, 126 L.Ed.2d 596 (1993), *citing Summer v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303,

1306, 71 L.Ed.2d 480 (1982). A claim of insufficiency of the evidence is a mixed question

of law and fact, requiring this Court to examine whether the state court's denial of relief was

contrary to or an unreasonable application of United States Supreme Court precedent.  *Penry*

*v. Johnson*, 215 F.3d 504, 507 (5th Cir. 2000);  *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir.

1995).

      The state appellate court, applying the *Jackson v. Virginia* standard, thoroughly

addressed petitioner's claims relative to sufficiency of the evidence  in a lengthy discussion,

as follows:

Defendant asserts that the evidence was insufficient to support her conviction under La. R.S. 14:30.1 A(3). Specifically, she maintains that the failure of the police to interview her son, Ian Hano, or his friend, Justin Whitfield,[23] amounted to an incomplete investigation and that the State's reliance on the victim's girlfriend, Crystal, who had a faulty memory, was on drugs at the time of her statement to the police, and gave inconsistent trial testimony that was not credible, was insufficient to establish beyond a reasonable doubt that defendant distributed or dispensed methadone to the victim or that the victim ingested or consumed the controlled dangerous substance. She also asserts that the evidence demonstrated that the methadone was, at most, a contributing factor to the victim's death but is insufficient to prove beyond a reasonable doubt that it was a direct cause of the victim's death.

In reviewing the sufficiency of the evidence to support a conviction, a Louisiana appellate court is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). That standard of appellate review, which was adopted by the Legislature in enacting La.C.Cr.P. art. 821, is whether the evidence, when viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. *State v. Brown*, 2003-0897, p. 22 (La.4/12/05), 907 So.2d 1, 18. The *Jackson* standard of review is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt.

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence not its sufficiency. *State v. Richardson*, 459 So.2d 31,

---

[23]According to the record, Ian was nearly twelve years old at the time of the offense and fourteen at the time of trial. At trial Justin did not testify as to his age, although he indicated that he was in the ninth grade(footnote in text of state opinion).

38 (La. App. 1st Cir.1984). Accordingly, our role is not to assess credibility or reweigh evidence. *State v. Smith*, 94-3116, p. 2 (La.10/16/95), 661 So.2d 442, 443. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Higgins*, 2003-1980, p. 6 (La.4/1/05), 898 So.2d 1219, 1226, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005).

Louisiana Revised Statute 14:30.1 A(3) defines second degree murder as the killing of a human being when, among other things, the offender unlawfully distributes or dispenses a controlled dangerous substance classified in Schedule I or II, which is the direct cause of the death of the recipient who ingested or consumed the substance.[24] Methadone is classified as a Schedule II controlled dangerous substance. La. R.S. 40:964, Schedule II(B)(11). To support the conviction under La. R.S. 14:30.1 A(3), the record must contain evidence that: (1) defendant distributed or dispensed methadone to the victim, (2) the victim ingested or consumed the controlled dangerous substance, and (3) the victim died as a direct cause of ingesting or consuming the controlled dangerous substance.

For purposes of the Uniform Controlled Dangerous Substances Law, La. R.S. 40:961 to 40:995, "distribute" is "to deliver a controlled dangerous substance whether by physical delivery, administering, subterfuge, furnishing a prescription, or by filling, packaging, labeling or compounding the substance pursuant to the lawful order of a practitioner." La. R.S.

---

[24]The jury was instructed that second degree murder included the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm as set forth in La. R.S. 14:30.1 A(1). But the record is devoid of any evidence from which the jury could have inferred that defendant had the specific intent to kill or to inflict great bodily harm to the victim. Thus, the sole basis of the jury's verdict finding defendant guilty of second degree murder is under La. R.S. 14:30.1 A(3) (footnote in text of state opinion).

40:961(14). "Dispense" is "to deliver a controlled dangerous substance to the ultimate user or human research subject by or pursuant to the lawful order of a practitioner, including the packaging, labeling, or compounding necessary to prepare the substance for such delivery." La. R.S. 40:961(13). "Deliver" and "delivery" are defined as "the transfer of a controlled dangerous substance whether or not there exists an agency relationship." La. R.S. 40:961(10). The case law has defined "deliver" as transferring possession or control. The transfer of possession or control, i.e., distribution, is not limited to an actual physical transfer between the culpable parties but may be accomplished by the imposition of a third party. *State v. Parker*, 536 So.2d 459, 463 (La.App. 1st Cir.1988), *writ denied*, 584 So.2d 670 (La.1991).

A defendant may be guilty as a principal in the crime of distribution if she aids and abets in the distribution or directly or indirectly counsels or procures another to distribute a controlled dangerous substance. See La. R.S. 14:24. Although "[i]t is not necessary to 'sell' contraband to aid and abet its distribution" a "distributor" must do more than merely receive the controlled substance as a user. *State v. Celestine*, 95-1393, pp. 3-5 (La.1/26/96), 671 So.2d 896, 897-898 (per curiam) (and cases cited).

An appellate court is constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases; that determination rests solely on the sound discretion of the trier of fact. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. *State v. Azema*, 633 So.2d 723, 727 (La.App. 1st Cir.1993), *writ denied*, 94-0141 (La.4/29/94), 637 So.2d 460; *State v. Quinn*, 479 So.2d 592, 596 (La.App. 1st Cir.1985).

17

We turn first to defendant's contention that the evidence is insufficient to establish that she distributed the controlled dangerous substance to T.J.J. and that he ingested it. We find the following testimony descriptive of events and pertinent to our discussion.

Timothy L. Johnson, the father of the victim, testified that he became aware of T.J.J.'s drug use when he was arrested and enrolled in drug court. Although T.J.J. tested positive for the drug Ecstasy while in drug court and spent a couple weeks in a juvenile detention facility, he graduated from drug court without further incident in May of 2003. Crystal began residing with the Johnsons when she was thirteen years old. Apparently Crystal's mother moved a lot and, to keep Crystal in school regularly, Johnson invited Crystal to live with them. Three days before T.J.J.'s death, when he was sixteen and Crystal was fourteen, Johnson permitted T.J.J. to move into an apartment with Crystal near Crystal's aunt.

On July 9, 2003, at approximately 4:15 p.m., defendant called Johnson and told him that T.J.J. had taken an overdose. Defendant said that she was taking T.J.J. to St. Tammany Parish Hospital and that Johnson did not need to meet them there. At the hospital, Johnson talked to Crystal, who advised him that defendant had been the provider of the drugs that T.J.J. had taken.

Detective Fred Roshto, an employee of the St. Tammany Parish Sheriff's Office at the time of the incident who conducted the investigation of T.J.J.'s death, interviewed Crystal at the time of T.J.J.'s admission to St. Tammany Parish Hospital. Crystal told the detective that she and T.J.J. had purchased and ingested narcotics, and that T.J.J. appeared to have overdosed. Crystal said that leftover narcotics were located at their apartment in a wooden cigar box on the bedroom floor and gave Detective Roshto consent to search the apartment.

Detective Roshto could not locate the box. Crystal's aunt advised him that defendant had come to the apartment and retrieved the box, telling him where defendant lived. At her residence, Detective Roshto found defendant along with Falgout and Ian. Defendant told the detective that she had taken T.J.J. to the hospital and that Falgout had picked her up and brought her home from there; she had not gone anywhere after leaving the hospital. Detective Roshto advised defendant of her Miranda rights, explaining that he had reason to believe she had been to the victim's apartment. Stating that she was groggy, defendant then acknowledged she had returned to the residence to retrieve a DVD player. She also admitted that she had taken the cigar box, which contained marijuana, and that she had subsequently disposed of the box and its contents by tossing them into a dumpster at a gas station.

At Detective Roshto's request, defendant and Falgout agreed to provide further statements at the sheriff's office. At the station, defendant stated that she had thrown the cigar box and its contents on the side of the road. But when Detective Roshto advised her that the empty cigar box had been retrieved from a dumpster near her residence, defendant admitted she had thrown it there, continuing to claim that she had disposed of the marijuana on the side of the road.

The detective testified that at 11:46 p.m. on July 9, 2003, defendant gave a tape-recorded statement. Defendant stated that Crystal had called her residence earlier that morning and spoken to Falgout, telling him that she could not awaken T.J.J. Although defendant explained that she was not alarmed because Crystal and T.J.J. normally slept late, she nevertheless stated that she advised Crystal to call 911. Around 4:00 p.m., after running some errands, defendant went by the apartment to check on Crystal and T.J.J. and to retrieve her DVD player. When defendant entered the unlocked apartment, Crystal was sleeping and T.J.J. was unconscious. Defendant opened T.J.J.'s eyelids and noted his pupils were dilated. She performed CPR on T.J.J. and placed him in a tub of water, hoping to revive him. Crystal

did not want defendant to call 911 because she did not want to be evicted from the apartment. Defendant called Falgout to assist her. They attempted to induce vomiting and continued putting water on T.J.J. Defendant then decided to take T.J.J. to the hospital and contacted his father.

In the tape-recorded statement, defendant also stated that she went back to the apartment to retrieve the drugs because she did not want T.J.J. or anyone on the property to be penalized for possessing them. She speculated that the methadone T.J.J. had taken could have come from an acquaintance who had been in a motorcycle accident.

Defendant confirmed to Detective Roshto that she was taking methadone for chronic pain management based on a prescription from a Dr. Eliosoff. She indicated that her dosage was ten milligrams. She told Detective Roshto that she had noticed that six of her pills were missing and suggested that T.J.J. could have stolen them from her when he and Crystal had stayed with her for a couple of days.

Detective Roshto believed that defendant and Falgout were "doctor shopping," i.e., seeing multiple doctors at the same time in order to get prescription pain medication.[25] His investigation

---

[25]Pharmaceutical records confirmed that defendant had two other physicians whom she had not mentioned during her recorded interview: Dr. Pfingsten and Dr. McNulty. Pharmaceutical records confirmed that Falgout had been filling prescriptions written by a Dr. Jarrott. Between August 2002 and April 2003, defendant filled prescriptions from Dr. McNulty for carisoprodol, alprazolam, hydrocodone, prednisone, and nortriptyline. From April 2003 to July 2003, defendant filled prescriptions for methadone (ten-milligram pills), carisoprodol, and clonazepam (three prescriptions from Dr. McNulty, ten prescriptions from Dr. Eliosoff, and three prescriptions from Dr. Pfingsten). The specific dates of the methadone prescriptions are April 30, 2003, May 30, 2003, and June 30, 2003. Each methadone prescription was for 120 (ten milligram) pills. In May of 2003, defendant was seeing Dr. Bey, who was filling prescriptions for clonazepam, carisoprodol, and hydrocodone. Also in May of 2003, Dr. Eliosoff noted in defendant's medical records, "chronic pain syndrome and possible drug abuse" by defendant. Falgout had filled prescriptions for soma, lortab, xanax, clonazepam, carisoprodol, hydrocodone, and methadone (40 milligram diskette wafers).

also established that defendant was not receiving methadone from more than one doctor at a time and that according to defendant's doctors, she suffers from chronic pain.

Crystal testified that she was with T.J.J. at the time of his overdose. On July 8, 2003, near noon, Crystal observed T.J.J. acquire two methadone pills while they were at defendant's residence. Defendant asked T.J.J. whether he wanted to purchase methadone pills for five dollars a pill. Crystal specifically observed defendant place two methadone pills in T.J.J.'s hand. She did not see him give defendant the ten dollars in exchange, but T.J.J. told Crystal that he had. Crystal and T.J.J. went back their apartment, where she took one pill and he took the other.

Later that day, they returned to defendant's home, where Crystal, T.J.J., and defendant's son, Ian, smoked marijuana. Around 3:30 p.m., Crystal and T.J.J. purchased four more methadone pills. According to her trial testimony, Crystal was not sure whether she entered the trailer when the second transaction took place, but she was certain that T.J.J. and Ian had. During an audiotaped interview with Detective Roshto on July 10, 2003, Crystal had stated that she waited in the vehicle while the second drug transaction took place. She also told Detective Roshto that she and T.J.J. had paid twenty dollars to Falgout, who had given the money to defendant, and then defendant gave them the pills. But at trial, Crystal acknowledged that she did not actually see any part of the second transaction, indicating that portion of her audiotaped statement had been based on information that had been told to her by T.J.J.

According to Crystal's trial testimony, after T.J.J. purchased the pills, they went back to the apartment. She was not sure whether Justin was with them at the time, but she was certain that Ian was. Crystal and T.J.J. consumed two of the four pills, taking a portion by mouth and inhaling the rest. The next thing Crystal

recalled was waking up briefly the following morning and going back to sleep without noticing anything unusual. But that afternoon when she woke up, T.J.J.'s lips were purple. She tried to wake him up but could not. T.J.J. was making sounds from his lungs. She tried to give him mouth-to-mouth resuscitation and turned him over; T.J.J. vomited. Because she had seen defendant help Falgout before when he was in a condition similar to T.J.J.'s, Crystal called defendant. She did not call 911 because she was afraid.

After she and defendant had taken T.J.J. to the hospital, while standing near the emergency room entrance, defendant told Crystal that she should "tell [T.J.J.'s father] that [she] didn't know what happened, that somebody must have slipped him something in his drink." Crystal did not.

Justin testified for the defense, indicating that he had known T.J.J. for about two years. He described that the victim liked to "get loaded" and often consumed alcohol and pills like xanbars, somas, lortabs, and methadone. He had witnessed T.J.J. inhale a small white methadone pill the night before he was hospitalized but did not know from where it had come. Justin recalled having been with T.J.J., Crystal, and Ian all day on July 8th and accompanying them during the second trip to defendant's residence. When they arrived, T.J.J. indicated that he needed to talk to Falgout. Justin saw Falgout with a "handful of pills," but defendant was not present at that time, and he did not see any exchange of money for pills. He was with T.J.J., Crystal, and Ian when they drove back to the apartment. Crystal and T.J.J. argued about money. T.J.J. had money when they went to defendant's residence but did not have any on the way home; T.J.J. had no pills on the way to defendant's residence but had some on the way back. Subsequently, he watched T.J.J. crush some of the pills and as T.J.J. and Crystal snorted them. Later that evening, T.J.J. and Crystal took Justin and Ian back to defendant's residence. The next day, Justin and Ian returned to the apartment with defendant and helped in the attempts to revive T.J.J.

Ian testified on his mother's behalf, indicating that Falgout had given and consumed drugs with him in past. He stated that defendant had never given him drugs and that his mother did not know that Falgout had given him drugs. But Ian admitted that he and defendant occasionally smoked marijuana together. He knew that on occasion Falgout had paid T.J.J. with drugs instead of money for work T.J.J. had done for him. At the time of the second drug transaction, Ian remained in the vehicle with Crystal. He saw his mother talk to Crystal and noticed that she had given Crystal "something." But because he was listening to the radio, Ian could not hear the conversation between Crystal and his mother. He thought that his mother had taken the pills away from T.J.J. and given them to Crystal because she did not want the victim to take them. Later that night, he watched as T.J.J. and Crystal consumed the drugs. He also was present at the apartment the next day during the efforts to revive T.J.J.

During her trial testimony, defendant indicated that on the evening of July 8, 2003, Falgout had sold T.J.J. four ten-milligram methadone pills that belonged to her. She did not know about or agree with the transaction. Falgout had been abusive during their relationship and because she was afraid of him, she allowed the transaction to take place. Falgout consumed and sold a lot of his medication, and, therefore, she shared her medication with him.

After Falgout gave the pills to T.J.J., defendant told T.J.J. to give them to her, indicating she wanted to talk to Crystal whom she thought would not approve of the transaction. She then gave the pills to Crystal, believing that Crystal would not allow T.J.J. to consume them.

Defendant admitted that she had lied during her statement to the police when she told them that she had discarded the contents of the cigar box, explaining she had been afraid and did not have an attorney present. In court, she said that she had actually placed the remaining pills back into her pill bottle.

23

Defendant denied having sold two methadone pills to T.J.J. prior to Falgout's sale of four pills. She admitted that she allowed her son and other minors to "do drugs" in her home reasoning that it was a safe place and suggesting that the other parents were aware of the drug use. Falgout financially supported the household with the money that he made from drug sales. When asked whether she had distributed four ten-milligram methadone pills, defendant admitted, "I distributed-I gave [Crystal] what [Falgout] sold [to the victim]. Yes, sir."

When Crystal first called defendant the next day, she told her to call 911, stating that it had not occurred to her that T.J.J. had consumed the methadone pills. She then ran errands. Defendant admitted that she had asked Crystal to lie, stating, "I asked her to tell them that maybe someone had slipped something into his drink only because Crystal had partaked (sic) in this, and I had partaked in this, and [Falgout] had partaked in this." Defendant added that she loved T.J.J. and did not want him to get into trouble. She did not know or understand why Crystal had implicated her since Falgout was the one who had actually sold the drugs.

Based on this testimony, the evidence, when viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact beyond a reasonable doubt that defendant distributed and dispensed methadone to T.J.J., and that he ingested it. The jury was required to consider the veracity of the testimony and give it the weight it deemed appropriate. And it was free to accept in whole or part the testimony of any witness. Apparently, the jury found Crystal a credible witness, which was within its province. Crystal testified that she witnessed defendant deliver to T.J.J. two pills. This testimony establishes that defendant distributed methadone to the victim. Crystal also testified that she and T.J.J. each took one of the two pills, thereby establishing that T.J.J. ingested the methadone. Because Crystal's testimony alone is sufficient to support the first two elements necessary to uphold a conviction under La. R.S. 14:30.1, whether Crystal was present and actually witnessed the

second transaction is of no moment. Moreover, although her testimony is not in conformity with Crystal's on the particulars, defendant admitted knowledge of and involvement in the second methadone sale. The jury was free to reject defendant's claim that she had not sold any pills to T.J.J. and had merely given the four pills that Falgout had sold to him in the second sale to Crystal rather than to T.J.J. And while defendant complains that the criminal investigation was faulty in that it failed to include statements by Justin and Ian, the jury was privy to that testimony and apparently found it insufficient to establish defendant's innocence. Accordingly, the evidence supports beyond a reasonable doubt the jury's conclusions that defendant distributed methadone to T.J.J. and that he ingested the illicit drugs.

We turn now to defendant's challenge of the sufficiency of the evidence insofar as it establishes that the direct cause of T.J.J.'s death was the ingestion of the methadone she had distributed to him. The record discloses the following relevant evidence.

Dr. James Robinson, who treated T.J.J. during his hospitalization, was called as a witness for the defense. Dr. Robinson explained that a measurement for the level of benzodiazepine in the T.J.J.'s system at the time of his hospitalization was not requested because it would not have influenced T.J.J.'s treatment. According to Dr. Robinson T.J.J. died as a result of a hypoxic brain injury, which caused his brain to starve from lack of oxygen. The ingestion of methadone along with any other drugs that T.J.J. may have taken could have caused acute respiratory depression and resulted in the hypoxic brain injury. He explained that, in general, all narcotics have the ability to suppress the body's inherent drive to breathe. If the levels become low enough, the brain suffers a hypoxic injury. Eventually, the damage is irreparable. Dr. Robinson opined that the hypoxic injury could have also been caused when T.J.J. vomited. He explained that a person whose level of consciousness is sufficiently depressed will not protect his own airway and when vomiting could then inhale the vomitus into

25

his larynx, airway, and lungs causing a hypoxic injury. Dr. Robinson agreed that methadone was a nausea-producing drug that sedates those who ingest it and causes the vomiting that could have resulted in the hypoxic brain injury. He also acknowledged that the hypoxic injury was traced to the ingestion of methadone whether it was a result of an acute respiratory depression or vomiting.

Defense witness Dr. William George, a toxicologist at Tulane Medical Hospital,  testified that based on the medical information available, he could not determine whether methadone alone was the direct cause of T.J.J.'s death. He explained that the benozodiazepine found in T.J.J.'s body was also unlikely to have been a direct cause of death. But the combination of the two drugs causes people to die and in this case the presence of the methadone cannot be separated from the presence of the benozodiazepine. He stated that methadone was clearly a component in causing T.J.J.'s death, emphasizing that it was the combination of the drugs that gave rise to his death. Dr. George agreed with Dr. Robinson that aspirated vomitus was a possible cause of death. He stated that the combination of ingesting methadone and benzodiazepines led to central nervous system and respiratory depression which, alone or in combination with aspiration, was the actual cause of death. Dr. George agreed that the ingestion of methadone causes vomiting and, like Dr. Robinson, acknowledged that the ingestion of methadone was a mechanism of T.J.J.'s death whether it was a result of an acute respiratory depression or vomiting.

Dr. Michael Defatta, the chief deputy coroner and forensic pathologist for St. Tammany Parish, testified that an autopsy was not performed on T.J.J. because his medical records were sufficient to determine the cause of death. Dr. Defatta explained that respiratory suppression/depression occurs when particular drugs block receptors in the brain that tell the body to breathe. Methadone is a very potent synthetic opiate that binds to the receptors in the central nervous system and blocks the action of those receptors. Benzodiazepines are in the sedative hypnotic

26

class and are used to treat anxiety. They also serve as a central nervous system depressant, meaning they will block receptors in the brain and inhibit those receptors from acting properly. Dr. Defatta confirmed that in this case, the intake of the methadone and benzodiazepine was the direct cause of the T.J.J.'s death. Dr. Defatta believed that an earlier intervention may have saved his life.

Based on the medical testimony, we find the evidence was sufficient to convince a rational trier of fact that the methadone was the direct cause of T.J.J.'s death. All three medical experts agreed that whether T.J.J. died as a result of respiratory suppression from ingesting the combination of drugs or from vomiting, which may have been caused by either or both drugs, it was the presence of methadone and benzodiazepines that gave rise to the hypoxic brain injury that ultimately caused his death.

Defendant intimates that in order to be a direct cause of death, the presence of the methadone would have had to have been the only drug that gave to the hypoxic brain injury. We disagree.

Defendant has cited, and we have found, no jurisprudence to support a finding that the direct cause required to be proven under La. R.S. 14:30.1 A(3) must be the only cause of the death of the recipient who ingested or consumed the controlled dangerous substance. The evidence established that the ingestion of the methadone T.J.J. obtained from defendant set in motion the train of events which brought about T.J.J.'s death. But for the ingestion of the methadone that defendant distributed to T.J.J., he would not have died. That the methadone acted in concert with the benzodiazepine in his body does not eliminate its effect in directly causing T.J.J.'s death. See *State v. Jones*, 598 So.2d 511, 514 (La.App. 1st Cir.1992) (finding that it is not essential that the act of the defendant should have been the sole cause of the victim's death; if the act hastened the termination of life, or contributed to the victim's death, in a degree sufficient to be a clearly contributing cause, the defendant's act constituted the "legal cause" of death). Thus, the medical testimony is evidence

27

beyond a reasonable doubt that supports the jury's conclusion that T.J.J. died as a direct cause of ingesting the methadone defendant distributed to him.

Accordingly, we find the evidence was sufficient to convince a rationale trier of fact that all the elements of La. R.S. 14:31.1 A(3) were proven beyond a reasonable doubt. This assignment of error lacks merit.[26]

In order to properly review petitioner's sufficiency of the evidence claim, the undersigned Magistrate Judge reviewed all of the testimony in this case. With regard to Hano's challenge based upon the element of the charge requiring that methadone be a direct cause of the minor victim's death, the testimony of medical experts was critically important.[27] Dr. Robinson, when asked directly whether the methadone was a direct cause of T.J.J.'s death, indicated that there was no way to know for certain.  However, he did acknowledge that the ingestion of methadone was linked to the hypoxic brain injury either as a result of acute respiratory depression or from the aspiration of vomitus brought on by the nausea and vomiting associated with the drug's use.[28] By either method, the methadone would have contributed to the victim's death. Dr. George, on the other hand, explained methadone's

---

[26]*State v. Hano*, 938 So.2d at 187-191.

[27]Although Hano complains that no autopsy was conducted on the victim, in violation of LSA-C.Cr.P. Arts. 102 and 105, violations of state procedural rules are not cognizable on federal habeas review. See *Estelle v. McGuire*, 502 U.S.  62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992)("errors of state law, including evidentiary errors, are not cognizable in habeas corpus")(citing *Estelle*).

[28]State Rec. vol. 8, Transcript of proceedings dated 4/19/05, at pp. 5-12.

contribution to T.J.J.'s death as follows, "Methadone is clearly a component which would have been a contributing factor, and in combination with other medication such as benzodiazepine, possibly some other drug . . . would have, in fact, been the factors that caused his death. . .  I think I have to say that both drugs, benzodiazepine and methadone were contributing factors that clearly would have led to central nervous system depression, respiratory depression, which by themselves and/or in combination with aspiration, is the most likely cause from what I understand. . . I don't know as a matter of fact that methadone alone did it.  I do think that the combination is clearly the most likely thing here. "[29] Finally, the testimony of Dr. Defatta, the chief deputy coroner for St. Tammany Parish, continuously and consistently reinforced that both methadone and benzodiazepine, in combination, were the direct cause of T.J.J.'s death.[30] In sum, the expert testimony undeniably indicated that even if methadone was not the sole cause of T.J.J.'s death, it was a contributing and necessary factor.

The next question becomes whether the fact that methadone was found to be a contributing factor in T.J.J.'s death is enough to satisfy the statutory element set forth in Louisiana Revised Statute 14:30.1 A(3), which requires that the offender's distribution or dispensing of the controlled dangerous substance be the *direct cause* of the death of the

---

[29]State Rec. vol. 8,  Transcript of proceedings dated 4/19/05 at pp. 27-28.

[30]State Rec. vol. 4, Transcript of proceedings dated 4/20/05 at pp. 8, 16, 26.

recipient who ingested or consumed the substance. In applying the *Jackson* test, the U.S. Fifth Circuit has instructed a reviewing court to examine "the substantive elements of the criminal offense *as defined by state law*". *Dupuy v. Cain*, 201 F.3d. 582, 589 (5th Cir. 2000) (emphasis added). See also, *Donahue v. Cain,* 231 F.3d 1000, 1004(5th Cir. 2000); *Terrick v. Cain*, 2008 WL 4297064 (E.D. La. 2008)(McNamara, J.).

        Louisiana courts have addressed the issue of whether the defendant's actions must be the **sole** cause of death in order for a murder prosecution to proceed.[31]  "In a prosecution for murder, the criminal agency of defendant as the cause of the victim's death must be established beyond a reasonable doubt. This court has held that '[i]t is not essential that the act of the defendant should have been the sole cause of the death; if it hastened the termination of life, or contributed, mediately or immediately, to the death, in a degree sufficient to be a clearly contributing cause, that is sufficient.'" *State v. Matthews*, 450 So.2d 644, 646 (La. 1984), citing *State v. Wilson*, 114 La. 398, 38 So. 397 (1905) (death from pneumonia caused by gunshot wound); *State v. Matthews*, 38 La.Ann. 795 (1886); *State v. Scott*, 12 La.Ann. 274 (1857). The *Matthews* court noted that a similar standard for determining causation-in-fact approved by LaFave and Scott in their treatise on criminal law was adopted by the Louisiana Supreme Court in *State v. Durio*, 371 So.2d 1158 (La.1979).

---

[31] The State specifically requested in Hano's case that the jury be instructed that the State need not prove that the drug that was distributed was the sole cause of death. See State Rec. vol. 2, State's First Requested Jury Instruction. However, the transcript of the jury instructions contains no such instruction. See Jury Instructions at State Rec. vol. 2.

*Matthews*, 450 So.2d at 646, citing  F. Wharton, Criminal Law § 26, at 126 (14th ed. 1978);

O. Warren, Homicide § 71 (1938). In *Durio*, the State could establish causation by showing

that the "defendant's conduct was a substantial factor in bringing about the forbidden result."

See also, *State v. Jones*, 598 So.2d 511 (La. 1st Cir. 1992)(Another mode of analysis is

determining whether or not the defendant's conduct was a substantial factor in bringing about

the forbidden result, i.e., the victim's death); *State v. Beason*, 653 So.2d 1274 (La. App. 2d

Cir. 1995)(Sufficient proof is presented where it is shown that the defendant's actions were

a "contributing cause" or a "substantial factor" in the resulting death of the victim).  In this

case, the medical evidence presented at trial unequivocally established that methadone was

a contributing cause and/or a substantial factor in T.J.J.'s death.

   Hano also complains that the police failed to conduct a complete and thorough

investigation of the case. Her complaint is primarily based upon law enforcement's failure

to interview Ian Hano (defendant's young son) or Justin Whitfield, Ian's friend. However,

both Ian and Justin were called by the defense and testified at trial. Since the jury had an

opportunity to hear their version of what happened to T.J.J., Hano fails to show how the

police's failure to interview these witnesses in any way undermines the sufficiency of the

evidence presented by the state in order to convict.

   With regard to Hano's claim that witness, Crystal Guidera, age 14 at the time

of the crime, was an unreliable witness, again the jury heard and apparently believed much

of her version of the events leading to T.J.J.'s death.    Guidera was subject to cross-examination and defense counsel spent a great deal of that cross-examination highlighting the areas where Guidera's recollection was faulty or where her trial testimony varied from her earlier statements to the police.   A reviewing *habeas* court does not revisit determinations of witness credibility for such issues are properly left to the province of the jury.  *Pemberton v. Collins*, 991 F.2d 1218, 1225 (5th Cir. 1993), *cert. denied*, 510 U.S. 1025, 114 S. Ct. 637, 126  L. Ed. 2d 596 (1993); *Summer v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982).  The AEDPA requires that the court presume that the jury's finding is correct unless rebutted by "clear and convincing evidence."  28 U.S.C. Section 2254 (e)(1).  Based upon a review of the evidence that was before the jury, this court cannot say that the jury's verdict and evaluations of credibility were unreasonable or unsupported by the record.

A claim of insufficiency of the evidence is a mixed question of law and fact, requiring this Court to examine whether the state court's denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent. *Penry v. Johnson*, 215 F.3d 504, 507 (5th Cir.2000); *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir.1995).  Petitioner fails to make such a showing thus her claim that the evidence did not support the judgment of a second degree murder conviction must fail.

## ERRONEOUS ADMISSION OF OTHER CRIMES EVIDENCE

Hano complains that, on the first morning before trial began, the State supplemented its earlier "Notice of Intent to Introduce Evidence of Other Offenses" (i.e., notice of admission of  404(B) evidence), therefore violating state procedural rules which require advance notice that other crimes evidence would be admitted (see LSA-C.E. Art. 404(B)). Essentially, in its earlier 404(B) notice, the State had indicated that admission of statements made by Hano to the victim's father, Crystal Guidera and others would be sought, said statements relating to efforts Hano had made to assist/revive the victim, reasons why she did not take the victim to the nearest hospital and her claim that "no one needed to go down" for the crime. In the State's supplementation of the 404(B) notice, the State sought to have another statement of Hano's made to Guidera admitted, where she allegedly advised Guidera to falsely report that someone had "slipped a Mickey" to the victim. Hano complains now that the trial court did not hold a hearing on the supplementary notice given by the State  and that the defense was prejudiced by the delay in notice.

Once again, Hano's claim that *state* procedural rules were not followed is not a claim cognizable during federal habeas review, pursuant to *Estelle*, 502 U.S. at 67-68, and, *Derden*, 978 F.2d at 1458. Hano must show that the state court error involved a "violation of the Constitution or laws or treaties *of the United States*." 28 U.S.C. §2254(a) (emphasis

33

added). In *Gonzales v. Thaler*, – F.3d –, 2011 WL 2305960 (5th Cir., June 13, 2011), the U.S. Fifth Circuit recently explained that, when reviewing a habeas claim that evidence was erroneously admitted, "[d]ue process is implicated only for rulings 'of such a magnitude'[32] or 'so egregious'[33] that they 'render the trial fundamentally unfair.'"[34]  Federal habeas courts may not "review the mine run of evidentiary rulings of state trial courts". *Gonzales*, *5.[35] Relief will be warranted only when the challenged evidence "played a crucial, critical, and highly significant role in the trial." *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) (citing *Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th Cir. 1986)).    The due process inquiry must consider the significance of the challenged evidence "in the context of the entire trial." *Thomas v. Lynaugh*, 812 F.2d 225, 230–31 (5th Cir. 1987) (collecting cases); *accord Guidroz v. Lynaugh*, 852 F.2d 832, 834–35 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 639 (1974). The *Gonzales* case also explained, "[T]he Due Process Clause does not afford relief

---

[32]*Id. citing Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir. 1976).

[33]*Id. citing Pemberton v. Collins*, 991 F.2d 1218, 1225 (5th Cir. 1993), *cert. denied*, 510 U.S. 1025, 114 S. Ct. 637, 126  L. Ed. 2d 596 (1993).

[34]*Id.* at 1227.  A fundamentally unfair trial is one "largely robbed of dignity due a rational process."  *Menzies v. Procunier*, 743 F.2d 281, 288 (5th Cir. 1984) (internal quotation marks omitted).

[35]*Id. citing Guidroz v. Lynaugh*, 852 F.2d 832, 834–35 (5th Cir. 1988); *see also Luna v. Beto*, 395 F.2d 35, 40 (5th Cir. 1968) (en banc) (Brown, C.J., concurring specially) ("[F]or an otherwise valid state conviction to be upset years later on federal habeas, surely something more than an evidentiary mistake must be shown.  If mistake is enough, then never, simply never, will the process of repeated, prolonged, postconviction review cease.").

where the challenged evidence was not the principal focus at trial and the errors were not 'so pronounced and persistent that it permeates the entire atmosphere of the trial.' This is a high hurdle, even without AEDPA's added level of deference." *Gonzales* *6 (cited cases omitted).

Hano attempted to raise this issue to the state appellate court in post-conviction proceedings but failed to meet the required showing.[36] Hano failed to comply with the state's procedural requirements when she failed to attach a copy of the state's original notice of intent to introduce other crimes evidence as well as the trial court's ruling on the motion. Nor did she provide a copy of the minute entries or transcripts or other documentation to support her claim. Thus, the First Circuit denied Hano's claim on the showing made, due to procedural deficiencies.[37] The Louisiana Supreme Court denied relief, relying on the findings of the lower court. Thus, Hano is procedurally barred from litigating this claim absent a showing of "cause" and "prejudice" or a fundamental miscarriage of justice.[38] She fails to make such a showing.

However, even if Hano could offer support for finding an exception to the procedural default of this claim, the claim would fail on the merits. Considering the admission of the challenged evidence, i.e., that the defendant told witness Guidera to falsely

---

[36]The issue was also raised on direct appeal but the Louisiana Court of Appeal, First Circuit, found the issue had not been preserved for appeal. *State v. Hano*, 938 So.2d at 185.

[37]See copy of First Circuit's decision in Writ No. 2008-KW-0474, State Rec. vol. 8.

[38]*Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

claim that someone else had "slipped a Mickey" to the victim, in the context of the entire trial, petitioner cannot show that the evidence was a critical factor in the jury's decision. The challenged evidence was merely cumulative since other evidence was offered by the State to show that the defendant was trying to cover up her involvement in the crime which had occurred. For example, the jury also heard that the defendant refused to go for medical help at hospitals closer to the victim's home because of concerns that those hospitals would ask too many questions.  The jury also heard that Hano had left the hospital after the victim was admitted and returned to the apartment to retrieve the drugs leftover in a cigar box and dispose of the box. Her statement to law enforcement about the location of the cigar box varied several times, but the box was finally recovered from a dumpster near Hano's residence. The jury also heard that Hano had given a statement to the police whereby she suggested that a friend of the victim's had given him the methadone. Ultimately, Hano admitted knowledge of and involvement in the second methadone sale. Thus, the admission of the "slipped Mickey" statement Hano made to Guidera could not have significantly impacted the jury's verdict. This claim is without merit.

## CRUEL AND UNUSUAL PUNISHMENT

Hano complains that her life sentence under the facts of her case amounts to cruel and unusual punishment, in violation of the Eighth Amendment to the U.S. Constitution as made applicable to the States by the Due Process Clause of the Fourteenth Amendment.

*Graham v. Florida*, – U.S. –, 130 S.Ct. 2011, 2018, 176 L.Ed.2d 825 (2010); *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Specifically, Hano complains that defendants in cases factually similar to her case have been given much more lenient sentences. Hano claims that, based upon her alleged role in the instant crime and her attempts to resuscitate and/or seek treatment for the victim, she should have been charged with negligent homicide rather than second degree murder, since she had no intent to kill or harm.T.J.J. and her actions "did not directly cause his death."[39] Hano also points to what she feels is an injustice: that her former boyfriend, whom she claims was the "more culpable party" in providing the drugs to the victim herein, pled guilty to manslaughter and received a 15 year sentence whereas she received a life sentence for second degree murder.[40]

The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to " 'the evolving standards of decency that mark the progress of a maturing society.' " *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion)). "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies

---

[39]See Rec. Doc. 1 at pp. 26-27.

[40]Hano's boyfriend and one time co-defendant, Craig Falgout, pled guilty to manslaughter in return for a sentence of fifteen years.

a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.' " *Kennedy v. Louisiana*, 554 U.S. 407, ——, 128 S.Ct. 2641, 2649, 171 L.Ed.2d 525 (2008) (quoting *Furman v. Georgia*, 408 U.S. 238, 382, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Burger, C.J., dissenting)). "[T]he 'clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures.'" *Atkins v. Virginia*, 536 U.S. 304, 312,122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), quoting *Penry v. Lynaugh*, 492 U.S. 302, 331, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Thus it is important to note that, although a charge of second degree murder under the facts of petitioner's case is clearly a serious charge (for which a severe penalty is required), such a charge is not out-of-line with similar laws in other jurisdictions.  For example, in Tennessee, the killing of another that results from the unlawful distribution of any Schedule I or II drug, when the drug is the proximate cause of the death of the user, results in a charge of second degree murder, with a sentencing range of 15 to 60 years. *See* T.C.A. §39-13-210 (a)(2).  In Rhode Island, Gen. Laws 1956, (1983 Reenactment) §11-23-6 provides for a life sentence and a charge of murder in the second degree for the delivery, distribution or sale of a controlled substance to a minor where death results. Also, under the Michigan Penal Code, M.C.L.A. 750.317a. makes it a homicide to deliver a Schedule I or II controlled substance to another person that is consumed by that person and causes the death of that person or another person; the penalty for this crime is a term of life or any term of

years. *See also* Florida Statutes Annotated (F.S.A.) §782.04(3), making it a crime of murder

in the first degree for the unlawful killing of a human being which results from the unlawful

distribution of any controlled substance, when such drug is proven to be the proximate cause

of the death of the user. Punishment for murder in the first degree under Florida law is either

death or life imprisonment.

   Federal courts accord broad discretion to a state trial court's sentencing

decision that falls within statutory limits. *Haynes v. Butler,* 825 F.2d 921, 923-24 (5th Cir.

1987); and, *Turner v. Cain*, 199 F.3d 437 (5th Cir. 1999) (unpublished) (sentence was within

Louisiana statutory limits and within trial court's discretion, therefore petitioner failed to

state cognizable *habeas* claim for excessive sentence).  If a sentence is within the statutory

limits, a federal *habeas* court will not upset the terms of the sentence unless it is grossly

disproportionate to the gravity of the offense. *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct.

2680, 115 L.Ed.2d 836 (1991); *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637

(1983). See also, *Jones v. Cain,* 2009 WL 928 477 (E.D.La., April 3, 2009 (Lemmon, J.);

*Lott v. Miller,* 2008 WL 4889650 (E.D.LA., Nov. 3, 2008) (Africk, J.) and, *Williams v. Cain,*

2008 WL 3363562 (E.D. La., Aug 8, 2008) (Barbier, J.).  Here, although petitioner wishes

her conviction were for no more than negligent homicide, the fact remains that there was

sufficient evidence for the jury to find her guilty of second degree murder (see discussion of

"Insufficiency of the Evidence", above). As a convictee for second degree murder, petitioner

received a life sentence, a sentence within the statutory limits since second degree murder requires a penalty of life without eligibility for parole, probation or suspension of sentence. See La.R.S. 14:30.1(B).

Additionally, the United States Supreme Court has stated that " '[t]he Eighth Amendment does  not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate" to the crime.'" *Ewing v. California,* 538 U.S. 11, 21, 123 S.Ct. 1179, 1185, 155 L.Ed.2d 108 (2003) (*quoting Harmelin,* 501 U.S. at 1001 (Kennedy J., concurring in part and concurring in judgment)). The Supreme Court has also recognized that only the rare case will reach the level of gross disproportionality.  *Id*., 538 U.S. at 30 (*quoting Harmelin,* 501 U.S. at 1005). Gross disproportionality of a sentence is "exceedingly rare" and found only in an "extreme" case. *Harmelin* at 1001, 111 S.Ct. 2680. Moreover, it is not enough that a federal habeas court, in its independent review of the legal question relative to excessive sentencing, believes that the state court decision was erroneous. The state court's application of clearly established law, in this case *Harmelin*, must be objectively unreasonable.  *Williams v. Taylor*, at 409, 102 S.Ct. 1495.

When the state appellate court reviewed Hano's excessive sentence claim, the court stated:

40

We find the record adequately justifies the trial court's refusal to deviate from the legislative mandate.[41]   The evidence indicates that defendant – alone or as a principal– intentionally distributed drugs to the minor victim.   Although she characterizes her role in the distribution of methadone to T.J.J. as "minimal," mindful of her active involvement in teenage illicit drug abuse within her home and given her almost familial connexity with Crystal, defendant's position of trust factored into the ease with which these minors obtained the methadone. . . . That Falgout, who pled guilty and avoided trial before a jury, received a more favorable sentence for his involvement in T.J.J.'s death does not diminish defendant's role in T.J.J.'s death. As Ian's mother and Crystal's so-called aunt, the record supports a finding that defendant was the source of contact for the illicit drug transaction.

Although defendant claims that her action of giving the four methadone pills to Crystal instead of T.J.J. has a mitigating effect that the trial court overlooked in imposing sentence, Crystal denied the veracity of the statement. Moreover, any mitigating effect created by a finding that she had taken the four methadone pills from the victim was offset by her admission that she gave them to another minor.

*State v. Hano*, 938 So.2d at 193-94.

To establish that her conviction for second degree murder and her resulting

sentence of life imprisonment is grossly disproportionate to her offense, Hano draws the

court's attention to several cases. First, she argues that the defendant in *State v. Downey*, 744

---

[41]Under *State v. Dorthey*, 623 So.2d 1276, 1278 (La. 1993), the sentencing court could have refused to apply the mandatory life sentence for Hano's second degree murder conviction if the court found it was unconstitutional; i.e., if the defendant had been able to show by "clear and convincing evidence" that she was exceptional or that unusual circumstances were present that made the life sentence not meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.

So.2d 128 (La. App. 4th Cir 1999) was far more culpable than she yet was found "not guilty"

after a jury trial. First it must be noted that Hano's analogy to the *Downey* case is misplaced

because one cannot compare whether the sentence Hano received is disproportionate by

comparing her sentence to someone who was actually *acquitted* of the same crime. Second,

it is obvious that Hano misunderstands the *Downey* case. The defendant in *Downey* was

charged with possession of heroin and moved to quash the bill of information after a jury had

*previously* acquitted him on a second degree murder charge (the identical statute under which

Hano stands convicted).   The district court agreed with the defendant that double jeopardy

barred the prosecution for heroin possession since the second degree murder charge (and

responsive manslaughter verdict) for which the defendant was acquitted was based upon the

same key element of the charge: the possession of heroin.[42] The State appealed and the

Louisiana Court of Appeal, Fourth Circuit, affirmed the district court's ruling, finding double

jeopardy barred the subsequent prosecution. *Id.* at 132. Thus the *Downey* case stands merely

for its holding regarding double jeopardy, rather than offering any support that Hano's

conviction and life sentence for second degree murder is flawed.   To the extent that Hano

attempts to extrapolate that, since the defendant in *Downey* had earlier been acquitted of the

charge under La. R.S. 14:30.1A(3), she should also have been acquitted, this court is not

---

[42]The district judge's instructions to the jury in the first prosecution allowed the jury to
consider either cocaine or heroin as the controlled dangerous substance.

privy to all of the evidence submitted to the jury in Downey's first prosecution. The *Downey* case does mention, however, that the coroner's report indicated that the victim's body revealed the presence of cocaine but it was negative for heroin. Heroin was the last drug known to be used by the victim, who had injected it shortly before he became unconscious. Unlike the expert testimony given in Hano's case, the jury apparently was not told that either heroin, cocaine or both drugs  were contributing factors leading to the victim's death. The death instead was labeled as an "unclassified drug-related death" by the coroner's office, leaving the jury with less than satisfactory evidence of causation. *Id.* at 130. In sum, *Downey* provides no support for Hano's argument that her sentence to life in prison for second degree murder is unjust.

The second case put forth by Hano in support of her claim that her sentence is excessive is *State v. Chambers*, 933 So.2d 200 (La. App. 3rd Cir. 2006), *rehearing denied*, (July 26, 2006). The defendant in *Chambers* was prosecuted, like Hano, pursuant to La. R.S. 14.30.1 (A), specifically the provision dealing with when a killing results from the unlawful distribution or dispensing of a controlled dangerous substance.[43] The victim in *Chambers* was

---

[43]La.R.S. 14.30.1(A)(3) applies when the offender is the one who unlawfully distributes or dispenses a controlled dangerous substance to the person who dies from ingesting or consuming it and La.R.S. 14.30.1(A)(4) applies when the offender has unlawfully distributed or dispensed a controlled dangerous substance to *another* who subsequently distributes or dispenses of the controlled dangerous substance to the person who dies from ingesting or consuming it. Otherwise, the required elements are the same.  In *Chambers*, La.R.S. 14.30.1(A)(4) was the applicable provision.

found deceased and in a ditch. A subsequent autopsy revealed that he had a long, laundry list

of recently ingested and/or injected drugs in his body, including OxyContin, the drug which

the defendant had sold to an individual named Choplin, who in turn sold the drug to the

victim.  A jury found the defendant guilty of the compromise verdict of manslaughter.[44]  The

Louisiana Court of Appeal, Third Circuit, however, found the evidence insufficient with

regard to causation, i.e., that the OxyContin supplied by the defendant was the direct cause

of the victim's death. The court noted various problems with the State's evidence, including

that the state's experts gave conflicting testimony with regard to the lethal effect of the

victim's OxyContin level, lay testimony regarding the effect of certain dosages of OxyContin

conflicted with the expert testimony given,  and, that questions  arose with regard to the time

sequence of events as well as other "unanswered questions" from the state's other evidence.

*Id.* at 205. Ultimately, the court concluded, "[W]hile the evidence establishes beyond a

reasonable doubt that the defendant distributed an eighty milligram table of OxyContin to

Choplin, that Choplin distributed that substance to Reaux, and that Reaux and Cassidy (the

victim) converted the substance for intravenous use in Choplin's bathroom, the evidence does

not establish what amount of that tablet of OxyContin Cassidy injected and *does not exclude*

*the possibility of Cassidy having ingested more OxyContin from a different source* following

---

[44]The appellate court noted that manslaughter had been included in the jury charges as a responsive verdict and no one had objected. Therefore, as long as there was sufficient evidence to sustain a verdict of the charged offense, i.e., second degree murder, the court would uphold the compromise verdict of manslaughter. See *Chambers*, 933 So.2d 203-04.

the episode in Choplin's bathroom." *Id.* at 206 (emphasis added). Due to the conflicts and

deficiencies in the State's own evidence, the Louisiana Court of Appeal, Third Circuit

reversed the (compromise) manslaughter conviction and entered a judgment of acquittal. *Id.*

   Hano's case does not contain the same type of evidentiary deficiencies present

in *Chambers*. Once again this court is not privy to all of the evidence submitted to the jury

in *Chambers* but, at the very least, it appears that there was evidence sufficient to undermine

the state's burden of proof in that the victim may have ingested drugs from a different source

than from the defendant. *Id.* at 206. In Hano's case, there is no evidence that the methadone

ingested by T.J.J. was from a source other than Hano. Furthermore, with regard to Hano's

claim that the *Chambers* case establishes that her sentence is disproportionate, a finding of

insufficient evidence in *Chambers* does nothing to undermine the <u>sentence</u> which Hano has

received in her case.

   Finally, insofar as Hano would ask that the court compare the sentence received

in return for his guilty plea in co-defendant, Chad Falgout's case as well as for others[45] who

pled guilty to a similar offense, such a comparison cannot be made.  These other defendants

pled guilty to reduced charges and negotiated a reduction is sentence in return for waiving

their rights to a trial. The negotiated sentences, which resulted from the plea bargains to

---

[45]Hano has attached the news clippings for several other similar cases prosecuted in
Louisiana, for which guilty pleas were rendered. See Exhibit 33, included with Fed. Rec. Doc. 1.

lesser charges of these individuals, therefore, cannot be considered disproportionately lower than the sentence received after a trial and conviction for second degree murder by Hano. Moreover, "[s]etting aside the issue of which of them is more culpable. . . '[a] defendant cannot rely upon his codefendants' sentences as a yard-stick for his own.'" *Salinas v. Warden*, 992 F.2d 324 (5th Cir. 1993)(Not selected for publication in Federal Reporter), citing *United States v. Lindell*, 881 F.2d 1313, 1324 (5th Cir.1989), *cert. denied*, 493 U.S. 1087, 496 U.S. 926 (1990). "The proportionality principle does not compare sentences among codefendants but instead considers only whether a sentence is grossly disproportionate to the crime." *Witmer v. Houston*, 2006 WL 3698911 (D. Neb. Dec. 14, 2006), citing *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003).  Given the seriousness of Hano's crime (second degree murder) and the nature of her sentence (a mandatory life sentence), this court finds no error by the state court in its conclusion that the punishment received is not grossly disproportionate to the offense.  Hano is not entitled to relief on her Eighth Amendment claim.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Hano next attacks, on a variety of grounds, the effectiveness of her attorney's representation. Hano was represented by Attorney David Craig, Jr.  Many of Hano's claims against her lawyer have already been addressed within other claims previously addressed and those claims will be dealt with as expeditiously as possible.

Issues of ineffective assistance of counsel raise mixed questions of fact and law. *Virgil v. Dretke*, 446 F.3d 598, 604 (5th Cir. 2006). Therefore, petitioner is entitled to *habeas* relief on a claim of ineffective assistance of counsel only when the state court unreasonably applied clearly established federal law to the facts of the case. The state trial court denied relief on Hano's ineffective assistance of counsel claims, finding that the U.S. Supreme Court standard for ineffective assistance as set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) had not been satisfied.[46]

In *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, the Supreme Court established a two prong test for evaluating claims of ineffective assistance of counsel: a defendant seeking relief must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. With regard to the performance prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688, 104 S.Ct. at 2064. There is a strong presumption that an attorney's performance "falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S. Ct. at 2065. The defendant must overcome the presumption that the challenged action might be considered to be sound trial strategy. *Id*. (internal quotation and citation omitted).

---

[46]See November 24, 2008 decision of the trial court in State Rec. vol. 8.

In order to satisfy the prejudice requirement, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. It is clear that even "professionally unreasonable errors by counsel do not warrant setting aside a conviction if the error had no effect on the judgment".  *Larsen v. Maggio*, 736 F.2d 215, 217 (5th Cir.), *cert. denied*, 469 U.S. 1089, 105 S. Ct. 598, 83 L. Ed.2d 707 ( 1984).

The burden of demonstrating prejudice rests on the defendant.  *Strickland* , 466 U.S. at 693, 104 S. Ct. at 2067.  The defendant must demonstrate that an alleged error actually had an adverse effect on the defense.  "The hypothetical or theoretical 'might have beens' at a trial do not justify the issuance of a Writ.  Rather, the petitioner must demonstrate that the 'might have beens' *would have been* important enough to affect the proceedings' reliability." *Larsen*, 736 F.2d at 218 (emphasis provided).  If the defendant makes an insufficient showing on either component of the ineffective assistance of counsel inquiry, it is not necessary to examine the remaining prong of the test.  *Strickland,* 466 U.S. at 697, 104 S.Ct. 2069.

Petitioner first raised her issues of ineffective assistance of counsel on direct appeal but the court ruled that the issues were not the subject of appellate review but rather should be raised in post-conviction proceedings. Hano thus raised the claims again in her January

2008 post-conviction application filed with the state trial court.[47] The court initially found the claims repetitive but subsequently was ordered to review Hano's ineffective assistance claims by the Louisiana Court of Appeal, First Circuit.[48] In it's reasons for denying the ineffective assistance of counsel claims, the trial court reviewed Hano's claims under the appropriate U.S. Supreme Court standard set forth in *Strickland*, and stated:

> After a review of the record of defense counsel's performance throughout the entirety of the proceeding and trial, and efforts expended to establish a defense, it is clear that the defendant was afforded effective legal representation within the guarantees of the Sixth Amendment and that a reliable verdict was rendered in the case. The evidence overwhelmingly supports defendant's conviction and there is no reasonable probability that any alleged unprofessional errors on behalf of counsel would have resulted in the proceeding having a different outcome.

The higher state appellate courts affirmed the trial court's decision, without additional reasons.[49]

Hano first claims that her attorney failed to ask any questions at the 404(b) (other crimes evidence) hearing held on March 31, 2005. At that hearing, which was actually a combined 404(b) and motion to suppress hearing, Officer Roshto, of the Abita Springs Police Department testified regarding his investigation of the subject crime and the events leading

---

[47]See a copy of the application in State Rec. vol. 7.

[48]See First Circuit Writ 2008-K-1377, dated 10/24/08 in State Rec. vol. 8.

[49]See First Circuit Writ 2008-KW-2562, dated 4/3/2009 and *State ex rel. Hano*, 25 So.3d 76 (La. 11/20/09).

up to the arrest of Jeanie Hano. Counsel for co-defendant, Chad Falgout,[50] cross-examined the State witness and presented argument to the court. At the end of the hearing, the trial court denied the motion to suppress and took the 404(b) evidentiary ruling under advisement. On April 18, 2005, immediately before trial began, the trial judge ruled that he was allowing the evidence to come in except he would not allow a reference to be made to Jeanie Hano distributing drugs. Also on April 18, 2005, the prosecutor informed the court and defense counsel that he had recently learned of  the statement made by Hano relative to telling Crystal Guidera to say that someone had slipped the victim a "Mickey".  Petitioner now complains that counsel failed to cross-examine witnesses at the March 31st hearing and that no contemporaneous objection was made to the other crimes evidence. Hano does not specify what particular 404(b) evidence counsel should have objected to or the basis for said objection. She also does not explain how counsel's apparent strategic decision not to question the investigating officer prejudiced her case.  To the extent Hano is attempting to argue that it was error for counsel to allow the 404(b) evidence previously addressed in this Report and Recommendation to be admitted, as this court earlier explained, she did not show that this evidence "played a crucial, critical, and highly significant role in the trial".  *See Little v. Johnson*, 162 F.3d at 862. Without such a showing, Hano also cannot establish the requisite "prejudice" under *Strickland* to show that her counsel was ineffective.

---

[50]Falgout's case was not yet severed from co-defendant Jeanie Hano.

Hano's argument regarding counsel not properly preparing experts for trial also fails. Although there was some conflicting or confusing testimony regarding the levels of methadone in the victim's system, there was also lay testimony about the amount of methadone T.J.J. ingested and/or snorted. Moreover, all the experts uniformly agreed that methadone played a significant and contributing role in T.J.J.'s death. No prejudice from counsel's alleged lack of preparation of experts has been shown.

As to the failure to interview and present witnesses, the U.S. Fifth Circuit has repeatedly held that "complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative. *Day v. Quarterman*, 566 F.3d 527 (5th Cir. 2009), citing *Bray v. Quarterman*, 265 Fed.Appx. 296, 298 (5th Cir.2008). Thus, to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense. *Id. citing Bray* at 298*; Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir.1985). Hano has not satisfied such a showing. Although she claims that Falgout should have been called as a witness, Falgout's best defense was in pointing his finger at Hano as the person responsible for providing the methadone to T.J.J. He was also faced with charges arising out of the

victim's death and Hano cannot show that his testimony would have been favorable to her case even if he was willing to waive his Fifth Amendment rights to testify at Hano's trial. Hano also attempts to argue that counsel should have subpoenaed *all* treating physicians of the victim, hinting that the victim may have been improperly treated with "strong tranquilizers." Again, Hano makes only speculative assertions, and fails to set out the content of the witness's proposed testimony and fails to show that the testimony would have been favorable to her defense. Finally, Hano asserts that telephone records should have been subpoenaed for trial but she has never herself presented these phone records to the state courts or to this court nor has she shown how they would have undermined the state's case against her.

Hano also complains that counsel should have moved to suppress the statement made to police by Crystal Guidera but there was no basis for counsel to object to a statement made to law enforcement by a third party. A defendant generally has standing to challenge the admission of illegally obtained testimony only if the defendant's own constitutional rights were violated. *See e.g.*, *Clanton v. Cooper*, 129 F.3d 1147 (10th Cir. 1997)("[O]nly the victims of the unconstitutional conduct may challenge the unconstitutional nature of the officer's actions, because only their rights have been violated." *citing U.S. v. Moffett*, 84 F.3d 1291, 1293 (10th Cir. 1996); *Rakas. v. Illinois*, 439 U.S. 128, 139-40, 99 S.Ct. 421, 428-29, 58 L.Ed.2d 387 (1978)). To the extent Hano is actually complaining that the statement taken

from Guidera was coerced and thus unreliable, a defendant may raise a due process challenge to the government's use of a coerced confession. "Confessions wrung out of their makers may be less reliable than voluntary confessions, so that using one person's coerced confession at another's trial violates his rights under the due process clause." *Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994). Hano, however, fails to show that the statements made by Guidera were unreliable or coerced. Additionally, Guidera willingly testified at trial and her prior statements and testimony at trial were subject to cross-examination. The jury apparently found her testimony to be both reliable and credible. This court will not undo the credibility determinations of the trier of fact. *Pemberton v. Collins*, 991 F.2d at 1225.

Next, Hano complains that counsel failed to object to the responsive verdicts given to the jury in the jury instructions. She claims that the jury should have been given an instruction on manslaughter but instead her attorney specifically asked that manslaughter not be included during the charge conference. Clearly, counsel's request that the manslaughter charge not be given as a possible responsive verdict was a sound strategy decision that should not be challenged based upon hind-sight. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.")  Hano's

account of why she provided the methadone to Crystal Guidera and her claim that she was in a violent relationship with Falgout and cooperated in the drug purchase out of fear was a version of events that, if accepted by the jury, would have cast her in a sympathetic light. Counsel may have theorized that the jury, faced with either a second degree murder charge under La.R.S. 14:30.1, carrying a life sentence (of which the jury was informed) or a negligent homicide charge under La.R.S. 14:32, would choose the less severe crime with a sentence of not more than five years. If the jury had chosen manslaughter as a responsive verdict, the sentence for Hano still would have been severe – up to 40 years. See La.R.S. 14:31. Hano fails to show that such a strategy decision amounted to deficient performance by her lawyer. Nor can she show prejudice since the jury found sufficient evidence to convict for second degree murder.

Hano also claims that counsel failed to raise all "meritorious" claims because of the "abysmal state of the record." Specifically she claims that the state court record contains only "one pre-trial transcript" and the transcript of the charge conference is unavailable as it was not recorded. She also wishes that "off-the-record" discussions between her attorney and the state prosecutor during trial should have been recorded.  Hano cites the Louisiana Constitution for the following proposition, "No person shall be subjected to imprisonment . . .without the right of judicial review based upon a complete record of all evidence upon

which the judgment is based . . "[51] Hano's reliance upon the Louisiana Constitution is misplaced since this court is limited in its concern for violations of  federal constitutional rights rather than rights arising under state law and procedure.  Federal habeas relief is not available for alleged errors in the interpretation or application of state law. *Estelle*, 502 U.S. at 68, 112 S.Ct. at 480. Additionally, even under the Louisiana Constitution, off-the-record discussions and other such matters would not have to be recorded and made a part of the record as these portions of the record are not evidence.  Specifically, Louisiana C.Cr. P. art. 843 requires a stenographer's recording of all of the "proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel."  The type of "proceeding" contemplated by article 843 was addressed by the Louisiana Supreme Court in *State v. Gipson*, 359 So.2d 87 (La.1978). That court explained that a proceeding consisted of a formal hearing or trial. It did not include an ex parte ministerial function that by its very nature occurs informally at times and places that do not lend themselves to delays and formalities attending recordation of facts and reasons. *Gipson*, 359 So.2d at 89. The plain wording of Article I, § 19 extends defendant's constitutional right to a complete record only as to all *evidence* upon which the judgment is based(emphasis added). With regard to any

---

[51]See Hano's petition, Rec. Doc. 1 at p. 40 of the Memorandum, citing Louisiana Constitution Article I, §19.

bench conferences held during trial that were not transcribed, the Louisiana Supreme Court has "never articulated a *per se* rule either requiring the recording of bench conferences or exempting them from the scope of La.C.Cr.P. art. 843". *State v. DiLosa*, 849 So.2d 657 (La. App. 3rd Cir. 2003), citing *State v. Deruise*, 802 So.2d 1224, 1236 (La. 2001). Article I, § 19 mandates only  that "evidence" be recorded and that generally does not encompass bench conferences, as they do not satisfy the materiality requirements of La.C.Cr.P. art. 843. *Id.*; *Deruise*, 802 So.2d at 1236-37. Hano makes no showing that she was prejudiced from any "gaps' in the record of her criminal trial.

In sum, petitioner fails to meet the prerequisites of *Strickland* to establish that she received ineffective assistance of trial counsel. None of her ineffective assistance claims warrant federal habeas relief.

## FAILURE TO DISCLOSE PLEA BARGAIN AGREEMENTS

Petitioner alleges that the State failed to 'reveal the deal", i.e., failed to disclose the plea deals which Hano alleges were made with Chad Falgout and Crystal Guidera in return for their "cooperation." The State is obligated to disclose information that could be used to impeach the testimony of a witness for the government, including any agreements with government witnesses for testimony in return for monetary benefit or for more favorable treatment within the criminal justice system.  *See Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The disclosure of plea agreements is particularly important

56

where the case against the defendant depended almost entirely upon the testimony of cooperating witnesses. *Giglio,* 405 U.S. at 154-55.

First, Falgout was not a witness at Hano's trial, so he could offer no cooperating testimony to assist the State in convicting Hano. Nor has Hano presented evidence that he had made a plea agreement with the State prior to her trial. Falgout's plea bargain agreement to 15 years in return for a manslaughter conviction occurred after Hano's conviction. Although "evidence of any understanding or agreement as to a future prosecution would be relevant to [the witness's] credibility", Hano makes no showing that there was a future plea bargain in the works nor that Falgout would have had reason to believe that the state "was in a position to implement ...any promise or consideration." *See Lacaze v. Warden Louisiana Correctional Institute*, – F.3d –, 2011 WL 2556031 (June 29, 2011), citing *Napue v. Illinois*, 360 U.S. 264, 270 (1959); *Giglio*, 405 U.S. at 154-55. Likewise, Hano presents no evidence that Guidera received more favorable treatment from the State in return for her testimony. Guidera was only 14 years old at the time of T.J.J.'s death thus the State's decision not to prosecute her for her role in T.J.J.'s death may have more to do with her being a juvenile than with any cooperation she provided. The burden of establishing she is entitled to habeas relief rests upon the petitioner and Hano simply fails to establish that a plea agreement/agreement not to prosecute existed between the State and Falgout or Guidera which should have been disclosed. This issue is also without merit.

## CUMULATION OF ERRORS

Finally, Hano argues that the cumulation of errors during her trial warrants federal habeas relief.  Federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process." *Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992), citing *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400-01, 38 L.Ed.2d 368 (1973). After a thorough review, and having found no merit to any of the claims raised in Hanos' federal application, the court finds no errors of a constitutional magnitude affected Hano's trial. This case thus fails to satisfy the standard set forth by *Derden* to establish a due process violation for cumulative errors.

## RECOMMENDATION

Accordingly, it is recommended that petitioner's application for habeas corpus relief be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14)

days after being served with a copy shall bar that party, except upon grounds of plain error,

from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); *Douglass v. United*

*Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[52]

New Orleans, Louisiana, this 6th day of July, 2011.

_____

LOUIS MOORE, JR.

UNITED STATES MAGISTRATE JUDGE

---

[52]*Douglass* referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.